IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2020 Session

**MICHAEL LEE BROWN V. JENNIFER KAREN BROWN**

**Appeal from the Circuit Court for Montgomery County**
**No. CC16CV492      Kathryn Wall Olita, Judge**

_____

**No. M2019-00693-COA-R3-CV**

_____

Divorcing parents of a minor child agreed to all terms of the divorce other than the permanent parenting plan. Following an evidentiary hearing, the trial court designated the father as the primary residential parent. The mother appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Dana McLendon, Franklin, Tennessee, for the appellant, Jennifer Karen Brown.

Bethany Cecilya Brasher, Franklin, Tennessee, for the appellee, Michael Lee Brown.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Michael Lee Brown ("Father") and Jennifer Karen Brown ("Mother") were married in 2005, had a child ("Child") together in 2011, and separated in 2014. Father filed a complaint for divorce in March 2016, and Mother filed a counter-complaint for divorce the following month. Both parties sought to be named Child's primary residential parent. The parties filed a marital dissolution agreement with the trial court in which they agreed to all terms of the divorce with the exception of the permanent parenting plan.

A trial was held in March 2019 to determine which parent should be designated Child's primary residential parent. The court heard testimony from Father, Father's brother, Mother, a friend of Mother's, and an investigator in the criminal division of the Montgomery County Sheriff's Department.

The evidence showed that the parties lived together in Clarksville from the time the parties were married until February 2015. Father, who was in the military, was relocated to Colorado in February 2015, while Mother remained in Clarksville with Child. Mother was Child's primary caregiver until she was arrested for an alcohol-related offense in June 2015. Father testified that Mother had a drinking problem. Before Child was born, Father stated that Mother became intoxicated once or twice a month. Once Child was born, Father testified, "the frequency and intensity [of Mother's drinking] increased substantially."

Mother's first charge for driving under the influence ("DUI") was in 2010, before Child was born. Mother was arrested and again charged with DUI in 2015, when Child was three years old. Father was stationed in Afghanistan when this occurred. Mother testified that she had been drinking at home when she decided to drive with Child to Red Lobster to pick up some food. Mother left Child alone in the car while she went inside. Mother testified that she ordered a drink at the bar, but rather than consuming it, she told someone at the restaurant that she needed to call for a ride because she felt "tipsy." Mother then telephoned a neighbor to ask for a ride home, but she was arrested before the neighbor could get to the restaurant. Someone else had apparently called the police to report a child unattended in Mother's car, and Mother was charged with DUI and child abuse, neglect, and endangerment. The evidence showed that Mother was required to serve twenty days in jail and her license was suspended for a year following her arrest. Father's commanding officer in Afghanistan informed Father that Mother had been arrested and that Child was "in trouble." Father received immediate leave and flew back to Clarksville to take custody of Child.

Father testified that he regularly communicated with Child using a video chat forum when Child was with Mother, and that Mother appeared to be intoxicated during some of these chats. Father explained:

> [Mother] would pass out unconscious, and [Child] would try to wake her up, you know, saying, "Mommy, Mommy." And I'd end up having to put [Child] to sleep via Skype. Tell her, "Baby, go get your pillow and your blanket and curl up on the couch right there in front of me." And I would sit there on Skype until one of the two of us ran out of battery, and then hope beyond that point that nothing happened.

Once Father took Child with him to Colorado in June 2015, Child remained in Colorado until November 2015, when Mother flew out to Colorado and took Child with her back to Clarksville. Child went back and forth between Mother and Father until September 2017, when Mother was arrested a third time and Child was placed into the State's custody. Mother was driving with her youngest child (Child's half-sibling) when she was arrested for public intoxication in September 2017. As Mother explained it, she had been drinking at home when she put her one-year-old in the car and drove with him to the gas station to buy more beer. The gas station attendant refused to sell Mother the beer

she tried to purchase and called the police "due to [Mother's] level of intoxication." When the attendant informed Mother of this, Mother said that she "sat down at the table and waited for [the police to arrive]." Mother was arrested and charged with public intoxication and child endangerment and neglect. Child was not with Mother when Mother was arrested, and Father was deployed at that time. Mother's fiancé was unable to take custody of Child following Mother's arrest because he failed a drug screen. Child was nearly six years old at this time. Child was initially placed by the State into foster care, and after a few days Child was placed with Father's brother.[1] Father's brother retained custody of Child until the following month, when Father was able to return from his deployment to take custody of Child.[2]

In October 2017, the Department of Children's Services ("DCS") filed a petition against Mother in the juvenile court asserting that Child was dependent and neglected. DCS stated in its petition that Mother was too intoxicated at the time of her arrest in September 2017 to provide sufficient information to the DCS caseworker about a safe placement for Child and Mother's other minor children. According to DCS's petition, one of its employees interviewed Child about Mother's alcohol consumption, and Child "disclosed that [Mother] does drink regularly and has been intoxicated around [Child]." The juvenile court held a hearing in March 2018, and Mother stipulated at that time to Child's dependency and neglect. The court found by clear and convincing evidence that Child was dependent and neglected and denied Mother's motion that Child be returned to her care. Child was placed in Father's custody, and Mother was granted unsupervised visitation with Child under terms to be worked out between Mother and Father.

Jeffrey Keith Blanchard was a criminal investigator for Montgomery County, and he testified about a 911 call Mother made in November 2018 in which she reported she was being "assaulted by unknown males." According to Mr. Blanchard, Mother gave three different accounts of what led her to call 911. Mr. Blanchard and his colleagues were unable to find any factual support to back up any of Mother's reports. When Mother went down to the Sheriff's office a few days later at the investigators' request, she confessed that she had made up the assault story because she and her fiancé had been arguing and "she thought he wouldn't be mad at her if she was assaulted by unknown subjects." Mother was charged with making a false report, which was a Class D felony. Mother admitted at trial that she had been drinking alcohol prior to making the 911 call.

The parties executed a Mediation Settlement Agreement on May 16, 2018, in which they settled issues regarding their marital property, marital debts, real property, retirement

---

[1]Father's brother testified that he was in Missouri when Mother was arrested in 2017 and that Child was placed into foster care until he was able to get to Clarksville to take custody of Child.

[2]When Mother was arrested in September 2017, she was under a July 2, 2016 order by the trial court to maintain an interlock device on her car that prevented her from driving if her alcohol level was above a certain limit. This court order also "restrained her from consuming any alcohol at any time."

accounts, bank accounts, and alimony. In this agreement, Mother "agree[d] to maintain an interlock device on her vehicle." Despite the court order dating from 2016 and this 2018 agreement, Mother did not maintain the interlock device on her car. Mother testified that she kept the interlock device on her car from the time she was arrested in 2015 until her probation was over in 2016. Mother put the interlock device back on her car when she was arrested in 2017, and she testified that it was still on the car at the time of trial.

Both parties introduced evidence that Child was subjected to inappropriate activity of a sexual nature with sons of each of the parties' paramours at Mother's house in Clarksville and Father's residence in Colorado. Both parties took steps to limit Child's interaction with each of these boys after learning of the inappropriate activity. Father is no longer seeing the mother of the boy at issue in Colorado, but Mother was engaged to the father of the boy at issue in Clarksville at the time of trial.

At some point prior to trial, Father requested and was granted a transfer to a nondeployable position with the military and relocated to Louisiana, where he resided at the time of trial. In Louisiana, Father employed a live-in nanny to help him with child-care. The nanny's responsibilities included picking Child up from school and watching Child until Father returned home from work around 5:00 in the afternoon. On the rare occasion that Father had to do some work-related activity in the evening, the nanny stayed with Child until Father returned home.

A friend of Mother's testified that she had known Mother since 2012. The friend had a child who was the same age as Child and had no concerns about leaving her child in Mother's care. Mother was a stay-at-home mother and the friend was employed by the military. The friend described Mother as "very eyes on, and she disciplined accordingly." The friend stated that she "had no question that if I was not in the house that my daughter would not be safe." The friend stated that she never observed Mother drink excessively or become intoxicated.

Father's brother testified on behalf of Father and stated that he observed Mother drinking on multiple occasions. Father's brother went to visit Father and Mother at least a couple of times a month after Mother and Father were married and Child was born, and the brother testified that whenever he saw her Mother was either intoxicated "or working on [becoming intoxicated]." When asked whether he believed Mother was "a truthful person," Father's brother responded, "No." As an example of her untruthfulness, Father's brother described a time when Mother told him her mother had committed suicide and she had to go to the funeral. At some later point in time, Mother "slipped up and said something about going to visit [her mother.]" Mother then admitted to Father's brother that she had made that story up and "[i]t didn't really happen." Father's brother described Father as "a great father" and "a great caregiver." Father's brother continued:

He's always teaching [Child] new stuff.  He's always taking [Child] on nature hikes.  They're always doing something around the house.  You know, going fishing, doing things [Child] likes to do, like playing with [Child's toys].  . . .  He's a great dad.  I couldn't be more proud of him.

Trial Court's Decision

The trial court issued a Memorandum Opinion and Order on March 26, 2019.  The court found that Mother was Child's primary caregiver during Child's first few years of life.  In addition to the evidence discussed above, the trial court noted Mother's allegations that Father had "failed to get the minor child medical treatment relating to a skin infection and leg fracture, an eye infection and dental care."  The court found that both parents had provided Child with medical and dental treatment, stating:  "[B]ecause the child has been exchanged back and forth between the parties so frequently for much of [Child's] young life, there is no intentional failure to provide the child with medical or dental care."

The trial court made a finding of credibility, stating, "During the course of this 7-hour trial, this Court had the opportunity to closely observe both parties and the Court specifically finds the Father's testimony to be credible."  The court then conducted a comparative fitness analysis as required by Tenn. Code Ann. § 36-6-106 to determine which parent should be designated Child's primary residential parent.  The court considered each factor set forth in the statute:

a. The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

**Both parties love the child and the child has good relationships with both parents. However, the Court finds that the nature of the child's relationship with Father is more stable. Father has had primary custody of the child since 2017 when Mother was arrested. To that end, Father has performed the majority of the parenting responsibilities in that time. Prior to 2017, the child spent time with both Mother and Father, particularly after Mother's 2015 arrest. The child's day-to-day schedule with [Child's] Father in Louisiana is predictable and consistent, which is a benefit to the child. While Mother is a stay-at-home mom, the minor child referenced the fact that Mother has two younger children who require a lot of Mother's attention. For all of these reasons, this factor favors Father.**

b. Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing

parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

**Father has demonstrated a past performance of parenting responsibilities. When Mother was arrested in 2017, Father asked the Army to place him in a non-deployable position so that he could be a full-time parent for the minor child. He has also shown the potential for future performance of parenting responsibilities by ensuring that the minor child has a consistent, dependable schedule. While Father's decision to withhold information from Mother about the second . . . incident [of inappropriate sexual-type activity with the son of Father's girlfriend in Colorado] was a bad choice, it does not evidence a complete lack of willingness to facilitate and encourage the minor child to have a relationship with Mother.[3] Further, the Court does not find that either party is guilty of intentionally denying parenting time in violation of a court order. Specifically, the Agreed Order of July 2, 2016 allowed for flexibility in the exchange of the minor child. Father's deployment as a member of the United States Army also played a part in making these parties' custodial issues more complicated, but he is not faulted for that. Father's concern about Mother's alcohol use and its effect on her parenting does not equate to an unwillingness to facilitate and encourage a close and continuing parent-child relationship between the child and Mother.**

**Mother has demonstrated a lack of ability to perform parenting responsibilities in the past. Specifically, she has had two serious alcohol-related incidents involving her children. On two occasions, DCS has had to involve itself in the care and protection of this minor child. Both times, there was a finding of dependency and neglect. While it does appear Mother is trying to make strides in abstaining from alcohol, she has had an incident involving police as recently as four months ago that also included her being under the influence of alcohol.**

---

[3]Father admitted at trial that he did not inform Mother of an incident that was sexual in nature between Child and the son of Father's former girlfriend that occurred in 2017. However, Father did not ignore the incident; he immediately addressed the situation with Child and arranged for Child to see a therapist.

**For all of these reasons, this factor favors Father.**

c. Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

**This factor is not applicable in this matter.**

d. The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

**Both parents are able to provide the child with food and clothing. Both parents have provided the child with medical care over the years and are able to continue to do so in the future. Currently the child is enrolled in school and doing well, bringing home A's and B's. With regard to other necessary care, the undisputed evidence of Mother's alcohol-related incidents, particular those involving her children, suggest that there have been occasions when Mother was not fully capable of providing other necessary care to the minor child. This factor favors Father.**

e. The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

**Father has had primary custody of the child since 2017 when Mother was arrested. To that end, Father has been the primary caregiver in that time. While Father utilizes the services of [a nanny] for approximately two hours every afternoon, Father's testimony that he is otherwise entirely responsible for parenting the child was not contradicted. Prior to 2017, the child spent time with both Mother and Father, particularly after Mother's 2015 arrest. Mother was responsible primarily for the child's care from birth until age 3, but Mother's legal troubles since that time resulted in dependency and neglect findings on two occasions. As such, this factor favors Father.**

f. The love, affection, and emotional ties existing between each parent and the child;

**Both parents love the child and the child loves, has affection for and emotional ties with both parents. This factor is equal as to both parties.**

g. The emotional needs and developmental level of the child;

**The Court is not aware of any developmental needs of the child. It remains to be seen what emotional needs she might have in the future as a result of the sexual events that have occurred in her young life. The stability present in Father's home is a benefit to the child and as such, this consideration favors Father.**

h. The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

**Both parents appear physically fit to parent the children. Father appears morally, mentally and emotionally fit to parent. Mother's alcohol-related incidents and other legal troubles do create a question of her fitness as it relates to the ability to parent. Two separate DCS investigations have resulted in dependency and neglect findings. It is true that Mother cooperated and completed all requirements placed on her in her second DCS case. However, in the span of 8 years, Mother has had three alcohol-related arrests and a felony false reporting charge that occurred when Mother had been drinking. This suggests that there are ongoing issues affecting her. This factor favors Father.**

i. The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

**[The nanny] has been a presence in the child's life since [Child] lived in Colorado. [The nanny] did not testify, but the evidence was undisputed that she was the child's provider at the CDC (on-post daycare [in Colorado]) prior to moving to Louisiana. Father no longer lives with [the mother of the boy who engaged in inappropriate activities of a sexual nature with Child].**

**The Court was not provided with any testimony regarding the minor child's relationship with [Mother's fiancé]. [Mother's fiancé] did not**

- 8 -

**testify at the hearing. The Court was provided, however, with the report of Dr. Jeremy Lynch which indicated the minor child had engaged in a sexual encounter with [the fiancé]'s son . . . . According to that report, the minor child says [Child] "doesn't have any problems with him now and isn't afraid of him." That is not a judgment that a seven-year-old is qualified to make. Mother testified, without dispute, that the minor child has a loving relationship with [Child's] younger brothers, who are 2 and 7 months. It is appropriate for [Child] to maintain a relationship with these younger siblings. Nevertheless, this factor favors Father.**

j. The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

**See a. and b. above. The child has primarily resided with Father since 2017. Father's current duty station in Louisiana provides a stable, satisfactory environment and this factor favors Father.**

k. Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

**The Court heard no credible evidence or allegation of physical or emotional abuse by the parents. Unfortunately, it does appear the child has encountered sexual situations not appropriate for her age in both Mother's home and Father's home. The situation has been rectified in Father's home, but not in Mother's home. To the contrary, Mother is engaged to [the minor perpetrator's father], which would result in the minor child and [the boy at issue] becoming stepsiblings residing together into the future. Mother testified that the children are under strict supervision and are on separate ends of the house, which would be appropriate. However, this factor favors Father.**

1. The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

**The Court heard limited testimony about [Father's live-in nanny], but none of it negative.**

**The Court heard no real testimony about [Mother's fiancé] aside from the fact that the minor child could not be placed with him at the time of Mother's 2017 arrest because he tested positive for THC. See also i. above regarding the [fiancé's son].**

- 9 -

**Based on the evidence provided at trial, this factor favors Father.**

m. The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

**This factor is not applicable in this matter.**

n. Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

**Father works while the child is in school and the nanny is responsible for [Child] for two hours in the afternoon. Mother is a stay-at-home mom and would be available to care for the child when [Child] was not in school. This factor is equal as to these parents.**

(Bold text in original).

After conducting the comparative fitness test, the trial court concluded that Father was comparatively more fit to be Child's primary residential parent. The court adopted the permanent parenting plan Father proposed, with the modification that Mother was to maintain an interlock device on her car for one year rather than permanently, as Father proposed. The parenting plan provided for Child to reside with Father full-time during the school year and to spend time with Mother during school breaks and other holidays. Under this schedule, Child would spend 275 days per year with Father and 90 days per year with Mother.

Mother appeals from the court's order designating Father as Child's primary residential parent and adopting Father's parenting plan, as modified.

## II. ANALYSIS

A. Standard of Review

In a non-jury case such as this, an appellate court reviews the trial court's findings of fact de novo upon the record, affording the findings of fact a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014). We review questions of law de novo, with no presumption of correctness given to the trial court's conclusions of law. *Kelly*, 445 S.W.3d at 692; *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). The *Armbrister* Court described the review appellate courts apply to cases involving parenting plans:

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011).

*Armbrister*, 414 S.W.3d at 693; *see also Kelly*, 445 S.W.3d at 692. "A trial court's broad discretion on custody matters extends to the question of which parent should be named primary residential parent." *Grissom v. Grissom*, 586 S.W.3d 387, 391 (Tenn. Ct. App. 2019); *see also Kathryne B.F. v. Michael David B.*, No. W2014-01863-COA-R3-CV, 2015 WL 4366311, at *8 (Tenn. Ct. App. July 16, 2015). As the *Armbrister* Court stated, "A trial court abuses its discretion in establishing a residential parenting schedule 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge,* 42 S.W.3d at 88). Mother must demonstrate that the trial court abused its discretion in naming Father the primary residential parent and adopting his proposed parenting plan to prevail on appeal.

B. <u>Primary Residential Parent Designation</u>

When a trial court is faced with divorcing parents who have one or more minor children, the court must determine the child(ren)'s primary residential parent by conducting a "'comparative fitness analysis.'" *Grissom*, 586 S.W.3d at 392 (quoting *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006)). In conducting this analysis, the court is required to consider the factors set forth in Tenn. Code Ann. § 36-6-106(a). *Id.*; *see also Chaffin*, 211 S.W.3d at 286.

As discussed above, the trial court here engaged in the comparative fitness analysis by addressing each of the factors set forth in Tenn. Code Ann. § 36-6-106(a). Mother

- 11 -

challenges the court's determination that factors (a), (b), (d), (e), (i), and (k) favor Father, and she argues that factor (n) favors her rather than both parties equally, as the court concluded. We will address each factor Mother challenges.

Factor (a) concerns Child's relationship with each parent and which parent has performed the majority of the parenting responsibilities. *See* Tenn. Code Ann. § 36-6-106(a)(1). Mother correctly points out that she was the primary parent for the first few years of Child's life until she was arrested for DUI in 2015, when Child was three years old. When Mother was arrested in 2015 and again in 2017, Father was deployed and flew home on an emergency basis to take custody of Child. Because Mother was too intoxicated when she was arrested in 2017 to inform DCS of a proper placement for Child, Child was taken into state custody and was required to live with a foster family for a number of days and then with Father's brother before Father was able to return from Afghanistan.

Father was living in Colorado while Mother was in Tennessee, and Father managed to make the necessary arrangements to be the full-time parent Child needed following both of Mother's DUI incidents in 2015 and 2017. After Mother's arrest in 2017, Father was able to transfer to a nondeployable position within the military and relocated to Louisiana. The evidence shows Father has provided Child with the stability at issue in factor (a). We agree with the trial court that factor (a) favored Father.

Factor (b) concerns each parent's ability to perform parenting responsibilities and the willingness to foster a relationship between the child and the other parent. *See* Tenn. Code Ann. § 36-6-106(a)(2). Mother contends that a court order provided that she was supposed to have time with Child starting on May 21, 2016, for "approximately two months." Rather than comply with this order, Mother complains that Father chose to have his mother care for Child during a month-long training exercise that occurred over this time period and did not send Child to live with Mother until June 24. However, nothing prevented Mother from traveling to Colorado to collect Child in late May 2016, and Mother introduced no evidence that she offered to travel to Colorado to collect Child from Father prior to the start of his month-long exercise. The evidence reveals that Father believed the dates of exchanging Child were flexible and that Father did not shorten the overall time Mother had with Child once Child was delivered to Mother. We note that the court order in effect during 2016 provided that the parties were to share the expenses of Child's transportation, yet Mother testified that she did not contribute to the cost of transporting Child to her from Father's residence in Colorado during the summer of 2016.

Mother also complains that Father did not comply with some of Mother's attempts to speak with Child when Child was with Father. Although the evidence supports Mother's argument to some extent, the overall evidence does not preponderate against the trial court's finding that Mother's DUI-related arrests in 2015 and 2017 demonstrated a lack of ability to perform parenting responsibilities. We agree with the trial court's determination that factor (b) favored Father.

Factor (d) concerns each parent's ability to provide food, clothing, medical care, and education. *See* Tenn. Code Ann. § 36-6-106(a)(4). Mother contends Father has neglected Child's medical needs and has returned Child to Mother with inadequate attention paid to Child's teeth and overall health. The evidence at trial showed that both parents have taken Child to the doctor and dentist when necessary and that neither parent intentionally ignored Child's medical or dental health. The trial court determined that this factor favored Father based on Mother's alcohol-related incidents, stating that Mother may not have been fully capable of providing necessary care to Child as a result of these incidents. Mother fails to show that the court erred in so finding. As a result, we affirm the trial court's finding that this factor favored Father.

Factor (e) considers which parent has been the primary caregiver. *See* Tenn. Code Ann. § 36-6-106(a)(5). Mother argues that because she has spent more time as Child's primary caregiver than Father since the time of Child's birth, factor (e) should weigh in her favor. However, "a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630-31 (Tenn. Ct. App. 1996). Mother takes issue with the court's focus on the time period since 2017, when Mother was last arrested for an alcohol-related event, and believes Father should be faulted for employing a nanny to care for Child for a couple of hours after school.

We believe the evidence shows that Father has been the more reliable caregiver since 2015, when Mother was arrested for her second DUI, the first since Child was born. The fact that Father works full-time and employs a nanny to watch Child in the afternoons until Father returns home from work does not detract from Father's status as Child's primary caregiver since 2017 and the more reliable and responsible caregiver since 2015, when Mother was arrested for DUI. We do not believe the evidence preponderates against the trial court's finding that factor (e) favored Father.

Factor (i) concerns Child's relationship with siblings and step-siblings as well as Child's involvement with school and extracurricular activities. *See* Tenn. Code Ann. § 36-6-106(a)(9). Mother testified about Child's close relationship with Mother's two younger children, which the trial court credited as important. However, the court was bothered by the fact that Mother was engaged at the time of trial to marry the father of the boy who engaged in inappropriate sexual activity with Child when Child was younger and that Child would be sharing a residence with this boy if Mother was named Child's primary residential parent. The son of Father's prior girlfriend who previously posed a danger to Child was no longer a threat to Child at the time of trial because the boy lived in Colorado and Father, who had moved to Louisiana, was no longer in a relationship with the boy's mother. Child will be able to see Child's step-siblings and maintain a relationship with them when Child visits Mother during school holidays and in the summer. We affirm the trial court's finding that factor (i) favored Father.

Factor (k) concerns any physical or emotional abuse to Child or any other member of either party's household. *See* Tenn. Code Ann. § 36-6-106(a)(11). The court addressed the sexual abuse Child suffered in both Mother's and Father's homes in the past and found it significant that the boy at issue in Colorado no longer posed a threat, whereas the boy at issue in Clarksville remained in the house with Mother. On balance, the trial court found that this issue favored Father, a result with which we agree.

The final factor Mother challenges is factor (n), which is concerned with the parents' employment schedules. *See* Tenn. Code Ann. § 36-6-106(a)(14). Mother is a stay-at-home parent, and she has two children younger than Child. Father has no other children requiring his time or attention. Father takes Child to school each day and employs a nanny for just two hours or so to watch Child after school until he is able to return home from work. This is not a case where a parent travels for work and is away from home for days or weeks at a time. Father's employment schedule does not impair his ability to be Child's primary residential parent. We agree with the court that this factor favors both parents equally.

"'[D]etermining a child's best interest is a fact-sensitive inquiry,'" *Grissom*, 586 S.W.3d at 393 (quoting *Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015)), and this determination

> "does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."

*Id.* (quoting *Solima*, 2015 WL 4594134, at *4). In determining that Father was better suited to function as Child's primary residential parent, the trial court focused heavily on Mother's alcohol-related arrests and other issues emanating from her drinking as well as the presence in Mother's household of one of the boys who had previously engaged in inappropriate sexual activity with Child. Given the broad discretion the trial court has in making this determination, we conclude that Mother has failed to demonstrate that the court abused its discretion or reached a decision that "'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge,* 42 S.W.3d at 88). We affirm the trial court's decision designating Father as Child's primary residential parent and adopting Father's proposed permanent parenting plan, as modified by the trial court.

- 14 -

## III. CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellant, Jennifer Karen Brown, for which execution may issue if necessary.

                                   _____

                                   ANDY D. BENNETT, JUDGE